Kent M. Roger (SBN 95987)
kent.roger@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
One Market Street
San Francisco, CA 94105
Tel:  415.442.1000
Fax:  415.442.1001

Clifford D. Sethness (SBN 212975)
clifford.sethness@morganlewis.com
Brian M. Hom (SBN 240055)
brian.hom@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel:  213.612.2500
Fax:  213.612.2501

Ronald F. Wick (admitted *pro hac vice*)
rwick@cohengresser.com
COHEN & GRESSER LLP
2001 Pennsylvania Avenue NW, Suite 300
Washington, DC 20006
Tel: 202.851.2070
Fax: 202.851.2081

*Attorneys for Defendant Pacific Maritime Association*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURF CITY STEEL, INC., *et al.*, | Case No. 2:14-cv-05604-BRO-SS |
| Plaintiffs, | The Hon. Beverly Reid O'Connell |
| vs. | **DEFENDANT PACIFIC MARITIME ASSOCIATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT OR, IN THE ALTERNATIVE, TO STRIKE CERTAIN PORTIONS THEREOF** |
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, *et al.*, | |
| Defendants. | [FRCP Rules 12(b)(6) and 12(f)]] |
| | Date:  March 6, 2017 |
| | Time:  1:30 p.m. |
| | Court:  7C-7th Floor |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................... 1

II.  STATEMENT OF FACTS ............................................................. 3

    A.   The PCLCD ........................................................................... 3

    B.   Plaintiffs' Allegations That They Have Lost Business ............................ 5

    C.   Absence of Allegations of Harm to Competition in Relevant Market ...... 6

III. RELEVANT PROCEDURAL HISTORY ........................................... 7

IV.  ARGUMENT ................................................................................ 8

    A.   The TAC Fails to Plausibly Allege Significant Anticompetitive Effects Within Any Relevant Market ........................................ 9

        1.   The Alleged Restraint Must Be Evaluated Under the Rule of Reason ............................................................... 9

        2.   The TAC Does Not Allege Significant Anticompetitive Effects Within Any Alleged Relevant Market. ........................... 10

            a.   Plaintiffs Have Not Adequately Alleged a Relevant Market ...................................................... 11

            b.   Plaintiffs Have Not Plausibly Alleged Anticompetitive Effects. .............................................. 13

    B.   Plaintiffs' Section 2 Attempted Monopolization Claim Should Be Dismissed for Failure to Allege That Any Entity Has a Dangerous Probability of Achieving Monopoly Power in Any Relevant Market..... 16

    C.   Plaintiffs' Antitrust Claim Is Barred by the Nonstatutory Labor Exemption to the Antitrust Laws. ............................................ 18

        1.   The M&R Provisions Primarily Affect the Parties to the PCLCD .................................................................. 18

        2.   The M&R Provisions Concern a Mandatory Subject of Bargaining .......................................................... 20

3.   The M&R Provisions Are a Product of Bona Fide, Arm's-Length Bargaining Between PMA and the ILWU. ...................... 20

D.   Plaintiffs' and the Iron Workers' New Claims Against PMA That Violate the Court's Joinder Order Should Be Stricken............................ 21

1.   The Iron Workers New Claims and Plaintiffs' New Damages Claims Against PMA Violate the Court's Joinder Order. ............. 21

2.   The Iron Workers' Claims and Plaintiffs' Purported New Damage Claims Should Be Stricken. ............................................. 23

V.   CONCLUSION ................................................................................. 25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1998)..........................................................9, 10, 14

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996)..................................................................11

*Antelope Valley Press*,
311 N.L.R.B. 459 (1993)......................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................8

*Benton v. Baker Hughes*,
No. CV 12-07735 MMM (MRWx), 2013 WL 3353636
(C.D. Cal. June 30, 2013)....................................................................23

*Bhan v. NME Hosps., Inc.*,
929 F.2d 1404 (9th Cir. 1991)..............................................................10

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999).........................................................11, 12

*Brown Shoe Co. v. U.S.*,
370 U.S. 294 (1962) ...........................................................................12

*Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*,
217 F. Supp. 2d 1028 (C.D. Cal. 2002)..................................................23

*Cascade Health Solutions v. Peacehealth*,
515 F.3d 883 (9th Cir. 2008)................................................................16

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008).................................................................11

*Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*,
833 F.2d 208 (9th Cir. 1987)................................................................14

*Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100,*
    421 U.S. 616 (1975) ............................................................................... 19

*DeLeon v. Wells Fargo Bank, N.A.,*
    No. 10-CV-01390-LHK, 2010 WL 4285006 (N.D. Cal. Oct. 22, 2010) ................ 24

*Eagle v. Star-Kist Foods, Inc.,*
    812 F.2d 538 (9th Cir. 1987) ................................................................... 17

*Eastman Kodak Co. v. Image Tech. Servs. Inc.,*
    504 U.S. 451 (1992) ............................................................................... 14

*Fantasy, Inc. v. Fogerty,*
    984 F.2d 1524 (9th Cir. 1993) ................................................................. 23

*Fogerty v. Fantasy, Inc.,*
    510 U.S. 517 (1994) ............................................................................... 23

*FTC v. Ind. Fed'n of Dentists,*
    476 U.S. 447 (1986) ............................................................................... 10

*Gerritsen v. Warner Bros. Entm't Inc.,*
    116 F. Supp. 3d 1104 (C.D. Cal. 2015) ..................................................... 24

*ILWU Local 13 (Cal. Cartage),*
    208 N.L.R.B. 994 (1974) .......................................................................... 3

*ILWU v. ICTSI Or., Inc.,*
    15 F. Supp. 3d 1075 (D. Or. 2014) ........................................................... 19

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.,*
    864 F.2d 1409 (7th Cir. 1989) ................................................................. 16

*Kendall v. Visa U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008) ................................................................... 9

*Kennedy v. Full Tilt Poker,*
    No. CV 09-07964 MMM (AGRx),
    2010 WL 3984749 (C.D. Cal. Oct. 12, 2010) ............................................ 24

*Knevelbaard  Dairies v. Kraft Foods, Inc.,*
    232 F.3d 979 (9th Cir. 2000) ..................................................................... 9

iv

*Mackey v. NFL*,
    543 F.2d 606 (8th Cir. 1976)...................................................................................18

*Metro Indus. v. Sammi Corp.*,
    82 F.3d 839 (9th Cir. 1996)...................................................................................11

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009)....................................................................................8

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ....................................................................................................9

*Oltz v. St. Peter's Cmty. Hosp.*,
    861 F.2d 1440 (9th Cir. 1988)...............................................................................11

*Pac. Mar. Ass'n*,
    256 N.L.R.B. 769 (1981) ...........................................................................................3

*Phoenix Elec. Co. v. NECA*,
    81 F.3d 858 (9th Cir. 1996)....................................................................18, 19, 20

*Pool Water Products v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001)...............................................................................15

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)....................................................................14, 15, 16

*Rosales v. FitFlop USA, LLC*,
    882 F. Supp. 2d 1168 (S.D. Cal. 2012) ...............................................................23

*Serpa v. SBC Telecomms., Inc.*,
    No. C 03-4223 MHP, 2004 WL 2002444 (N.D. Cal. Sept. 7, 2004).......................24

*Shipowners' Ass'n of the Pac. Coast*,
    7 N.L.R.B. 1002 (1938)...............................................................................................3

*Sliger v. Prospect Mortg., LLC*,
    789 F. Supp. 2d 1212 (E.D.Cal. 2011)...................................................................23

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001)....................................................................9, 11, 13

*Taylor v. Stave, Inc.*,
    No. CV15-4190 FMO (ASx), 2016 WL 6674987 (C.D. Cal. Jan. 4, 2016).............23

v

*Temple v. Synthes Corp.*,
    498 U.S. 5 (1990) ........................................................................................... 22

*Tunis Brothers Co., Inc. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991) ........................................................................... 12

*United States v. Richie*,
    342 F.3d 903 (9th Cir. 2003) ............................................................................ 3

*Universal Grading Serv. v. eBay, Inc.*,
    No. C–09–2755 RMW, 2011 WL 846060 (N.D. Cal. 2011) ..................................... 14

*Walters v. Fidelity Mortg. of Cal.*,
    730 F. Supp. 2d 1185 (E.D. Cal. 2010) ............................................................ 23

*Ward v. Apple Inc.*,
    791 F.3d 1041 (9th Cir. 2015) ........................................................................ 22

*Whittlestone, Inc. v. Handi-Craft Co.*,
    618 F.3d 970 (9th Cir. 2010) .......................................................................... 23

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*,
    668 F.2d 1014 (9th Cir. 1982) ........................................................................ 22

*William O. Gilley Enters. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ............................................................................ 9

**Statutes**

15 U.S.C. § 17 ..................................................................................................... 17

**Rules**

Federal Rule of Civil Procedure 12(f) .......................................................... 23, 24

Federal Rule of Civil Procedure 19(a) .......................................................... 21, 22

## I.    **INTRODUCTION**

Surf City Steel, Inc. and Sarens USA, Inc. ("Plaintiffs")—the only plaintiffs remaining in this case—allege that Defendant Pacific Maritime Association ("PMA"), a multiemployer collective bargaining association, and Defendants International Longshore and Warehouse Union and certain of its locals (collectively, "ILWU") entered into a collective bargaining agreement that violates the federal antitrust laws. Specifically, Plaintiffs challenge a provision in the agreement that allegedly requires PMA member operators of marine terminals to use only ILWU-represented workers for certain services, even if the terminal operators subcontract those services to other companies.  Plaintiffs, contractors who allegedly perform the services but who do not employ ILWU labor, claim that this provision unlawfully excludes them from competing for the terminal operators' business.

Plaintiffs' Third Amended Complaint ("TAC"), however, fails to plausibly plead a fundamental element of their claim:  harm to competition in a relevant market. At best, Plaintiffs' allegations establish that they, as *competitors* in some unpled market, have lost business opportunities as result of the collective bargaining agreement.  But to survive a motion to dismiss, Plaintiffs must also allege, in an economically plausible manner, that the restraint has injured *competition* in a relevant market.  Plaintiffs have not done so, and they cannot do so.

However Plaintiffs might define the market, it is clear from the TAC that the terminal operator members of PMA are purchasers in it—and that they are the *only* purchasers whose behavior could have been affected by the collective bargaining agreement.  Thus, Plaintiffs are suing the bargaining agent of their potential customers on the illogical theory that those customers are conspiring to injure competition among those who sell to them, thus forcing themselves to pay higher prices.

Antitrust conspiracies prohibited by Section 1 of the Sherman Act must make economic sense, and it makes no sense that purchasers in a market—the beneficiaries of rigorous competition—would tolerate, let alone willfully cause, a reduction in that

competition.  Notwithstanding Plaintiffs' disappointment that terminal operator members of PMA are allegedly choosing to take their business elsewhere by means of a labor agreement negotiated on their behalf, Plaintiffs' allegations of *harm to competition* are utterly implausible.  For this reason, the TAC should be dismissed.[1]

Plaintiffs' attempted monopolization claim under Section 2 of the Sherman Act fails for the separate reason that the TAC fails to identify any potential monopolist in any relevant market.  While Plaintiffs claim that the purpose of the alleged conspiracy is to create a monopoly for the ILWU, the ILWU is not even a participant—let alone a potential monopolist—in any relevant market.  Plaintiffs' theory, however, makes clear that their dispute is a labor dispute with the ILWU, rather than a commercial dispute with PMA—and that their claims, at best, raise labor law issues that are beyond the reach of the antitrust laws.  Accordingly, as a separate ground for dismissal, PMA asserts that the nonstatutory labor exemption to the antitrust laws immunizes Plaintiffs' allegations from antitrust scrutiny.

Finally, the TAC is procedurally defective.  On December 28, 2016, the Court granted the ILWU's motion to join PMA as a necessary party, finding that PMA's presence was necessary for the Court to address Plaintiffs' claim for injunctive relief.  Although the Court did not find PMA's addition as a party to be necessary to the disposition of Plaintiffs' *damages* claim against the ILWU, Plaintiffs, without seeking or obtaining leave from the Court, have asserted a treble-damage claim against PMA.  Moreover, the TAC purports to assert claims on behalf of various locals of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers ("Iron Workers")—including, on its face, damage claims against PMA— even though the Court previously dismissed those entities as plaintiffs.  Accordingly, Plaintiffs' and the Iron Workers' damage claims against PMA should be stricken.

---

[1] Although the TAC asserts three counts, Counts II and III assert claims against the ILWU that have previously been dismissed with prejudice.  (Dkt. #52)  Thus, Plaintiffs' antitrust claim is the only claim in the TAC that remains before the Court.

## II.    STATEMENT OF FACTS

The TAC alleges the following facts, which PMA neither admits nor denies but assumes as true for purposes of this motion:

### A.    The PCLCD

PMA is a private, non-profit multi-employer collective bargaining association representing private, for-profit ocean carriers, stevedore companies, marine terminal operators, and cargo-handling equipment maintenance companies that do business at West Coast ports.  (TAC ¶ 19.)  PMA is the collective bargaining representative for its member companies in collective bargaining negotiations with the ILWU, a labor union representing longshoremen and other categories of dock workers at West Coast ports.  (*Id.* ¶¶ 14-20.)

The terms of the collective bargaining agreements negotiated by PMA and the ILWU are memorialized in the Pacific Coast Longshore Contract Document ("PCLCD").  (*Id.* ¶ 39.)  In 2008, PMA and the ILWU negotiated a new PCLCD that, by its terms, applied to PMA members' employees who performed certain work, defined by the PCLCD, within California, Oregon, and Washington.  (Dkt. #80-4 (2008 PCLCD)).[2]  The 2008 PCLCD was the latest in an 80-year series of agreements granting the ILWU jurisdiction over "longshore work," including the maintenance and repair of cargo-handling equipment, at West Coast marine terminals.  *See generally Pac. Mar. Ass'n*, 256 N.L.R.B. 769, 771-774 (1981); *ILWU Local 13 (Cal. Cartage)*, 208 N.L.R.B. 994, 996-97 (1974); *Shipowners' Ass'n of the Pac. Coast*, 7 N.L.R.B. 1002, 1040-41 (1938), *aff'd*, 308 U.S. 401 (1940).

Section 1.7 of the 2008 PCLCD stated that the contract "shall apply to the maintenance and repair of containers of any kind and of chassis, and the movement incidental to such maintenance and repair."  (TAC ¶ 39(a).)  Section 1.71 added that

---

[2] The PCLCD may be incorporated by reference, as it forms the basis of the TAC, and the TAC refers to it extensively.  *See, e.g., United States v. Richie*, 342 F.3d 903, 908 (9th Cir. 2003) (a document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim").

3

1  the PCLCD "shall apply to the maintenance and repair of all stevedore cargo handling

2  equipment." (*Id.* ¶ 39(b).)  Section 1.72 acknowledged the introduction of new

3  technology in this context and addressed its impact on the work performed by ILWU

4  workers, providing, in relevant part:

5  It is recognized that the introduction of new technologies, including fully

6  mechanized and robotic-operated marine terminals, necessarily displaces

7  traditional longshore work and workers, including the operating, maintenance

8  and repair, and associated cleaning of stevedore cargo handling equipment.  The

9  parties recognize robotics and other technologies will replace a certain number

10  of equipment operators and other traditional longshore classifications.  It is

11  agreed that the jurisdiction of the ILWU shall apply to the maintenance and

12  repair of all present and forthcoming stevedore cargo handling equipment in

13  accordance with Sections 1.7 and 1.71 and shall constitute the functional

14  equivalent of such traditional ILWU work.

15  (PCLCD § 1.72.)

16  The 2008 PCLCD also provided a significant exception to its jurisdictional

17  provisions:  Pursuant to Section 1.8, the ILWU's jurisdiction over "maintenance and

18  repair work" would *not* apply at specific marine terminals that were identified as "red-

19  circled" in a contemporaneous Letter of Understanding incorporated as an appendix to

20  the PCLCD.  (*Id.*, at 218-23.)  That Letter of Understanding identified 30 separate

21  facilities at the ports of Oakland, Long Beach, Los Angeles, Tacoma, and Seattle as

22  exceptions to the ILWU's maintenance and repair jurisdiction.  (*Id.*)  Section 1.73

23  also specified an exception based on an employer's past practice to use non-ILWU

24  labor in the pre-commission installation of cranes.  (*Id.* § 1.73.)

25  According to the TAC, the ILWU has interpreted and enforced Sections 1.7,

26  1.71, and 1.72 (the "M&R Provisions") as applying to the following work, defined in

27  the TAC as the "Relevant Work":

28

4

. . . . the labor and services necessary for the non-operational structural maintenance and structural modification of cranes and movement of cranes and all other work in connection therewith; and the jacking, erection and modification of new cranes and of existing cranes and movement of new cranes and existing cranes in connection therewith.

(TAC ¶¶ 22, 40.)  The ILWU is further alleged to have interpreted and enforced the M&R Provisions as requiring "port managers" to use ILWU members to perform the Relevant Work—and, if those port managers' employees are not able to perform the Relevant Work, to subcontract that work only to contractors using ILWU labor.  (*Id.* ¶¶ 42-47.)  The scope of these provisions, however, is in dispute and has been the subject of arbitration proceedings between PMA and the ILWU.  (*Id.* ¶ 114.)

## B.    Plaintiffs' Allegations That They Have Lost Business

Plaintiffs allege that they are contractors that have performed the Relevant Work at West Coast ports but are not parties to the PCLCD and do not have a labor contract with the ILWU.  (*Id.* ¶¶ 5-6, 61.)  Plaintiffs do have a labor contract with the Iron Workers.  (*Id.* ¶¶ 5-6.)

Plaintiffs allege that prior to the 2008 PCLCD, *all* of the Relevant Work at West Coast ports was performed by Iron Workers members.  (*Id.* ¶ 35.)  According to Plaintiffs, *none* of the Relevant Work during this period was performed by ILWU members.  (*Id.* ¶ 36.)  As a result of the PCLCD, however, "port managers" who are PMA member terminal operators are not hiring Plaintiffs and other Iron Workers contractors to do the Relevant Work because such work "must be assigned to [the ILWU] and to contractors who only employ ILWU members."  (*Id.* ¶¶ 34, 40.)

The TAC alleges that the M&R Provisions "impose a barrier to entry to the market for the relevant work in the relevant market area" because "other unions and contractors which do not employ ILWU members are not able to participate in the market" (*Id.* ¶ 58.)  But Plaintiffs cannot allege that they are precluded from

performing *any* Relevant Work at West Coast ports.  Although the TAC alleges that the "port managers 'consume' 100% of the relevant work in the relevant market area" (*Id.* ¶ 62), Plaintiffs do not (and cannot) allege that all "port managers" are private terminal operators who belong to PMA.  And the M&R Provisions clearly do not prevent Plaintiffs from performing Relevant Work at "red-circled" locations or in situations where a "past practice" exception applies.  (PCLCD §§ 1.8, 1.73.)

### C.    <u>Absence of Allegations of Harm to Competition in Relevant Market</u>

Although the TAC defines "Relevant Work" (TAC ¶ 22), it does not define a relevant product market.  Nor does the TAC identify, or describe even in general terms, which entities are considered to be suppliers to the relevant product market— let alone whether there are reasonable substitutes for those suppliers or the services they provide.  The TAC thus does not even state whether the alleged relevant product market is a market for the labor supplied by individual workers or a market for the contract services performed by entities such as Plaintiffs.  Instead, the TAC makes the bizarre assertion that the "labor provided by union members" and the services "provided" by contractors have "inherent cross-elasticity of demand" and are thus "inextricably intertwined."  (*Id.* ¶¶ 23, 26, 28.)[3]

Whatever Plaintiffs regard as the relevant product market, they do not allege that the number of competitors in that market has been reduced.  To the contrary, as a result of the 2008 PCLCD, ILWU contractors who previously did not compete for the Relevant Work are now doing so; the TAC identifies a number of post-2008 projects in which ILWU contractors allegedly performed the Relevant Work.  (*Id.* ¶¶ 70-90.)

Nor does the TAC allege that the M&R Provisions were intended to reduce the number of contractors.  Rather, Plaintiffs allege that "the goal and purpose of these

---

[3] The TAC defines the relevant geographic market, or the "relevant market area," as "port facilities" in California, Oregon, and Washington.  (TAC ¶ 21.)  The TAC alleges no commercial basis for this definition, which appears to have been concocted solely to mimic the geographic scope of the PCLCD.

provisions is to allow [the ILWU] to monopolize the relevant work by controlling labor, the predominant component of the relevant work, and control the price of the relevant work." (*Id.* ¶ 59.)  And Plaintiffs freely admit that they "need not be eliminated as participants in the relevant market" as a result of the alleged conspiracy; they need only use ILWU labor to perform the Relevant Work.  (*Id.* ¶ 52.)

While the TAC makes the conclusory allegation that "the price of the relevant work in the relevant market area" has increased as a result of the 2008 PCLCD, the TAC does not plead with any specificity whether the increased "price" is the cost of labor or the price charged by contractors for services.  (*Id.* ¶ 59.)  Nor is there any allegation that ILWU-affiliated contractors were able to raise their prices for performing the Relevant Work as a result of reduced competition.

Most importantly, the TAC does not allege that, on balance, competition in any relevant market has been reduced—particularly after accounting for the obvious procompetitive, cost-saving efficiencies achieved from the introduction of new technologies, including robotics, enabled by the M&R Provisions.  (*See* PCLCD § 1.72.)  Such an allegation, of course, would be tantamount to an allegation that PMA member terminal operators have willfully acted to their economic detriment.

## III.   RELEVANT PROCEDURAL HISTORY

The original Complaint in this action, as well as the First and Second Amended Complaints, were filed on behalf of both the current Plaintiffs and various Iron Workers locals, and named only the ILWU entities as defendants.  (Dkt. ##1, 41, 47.)  On June 18, 2015, the Court dismissed the Iron Workers' claims with prejudice, as well as the current Plaintiffs' non-antitrust claims against the ILWU, leaving only the current Plaintiffs' antitrust claim against the ILWU in the case.  (Dkt. #52.)

On October 27, 2016, the ILWU filed a motion to join PMA as a necessary party, arguing that the (then-operative) Second Amended Complaint sought to enjoin enforcement of the M&R Provisions, and that the Court could not grant such an

1  injunction in the absence of both parties to the PCLCD.  (Dkt. #104.)  In opposition,

2  Plaintiffs asserted that they "are not challenging the language of the PCLCD itself"

3  and that PMA "has not engaged in anti-competitive conduct but rather has argued

4  against same."  (Dkt. #105, at 3, 6.)  On December 28, 2016, the Court granted the

5  ILWU's motion, agreeing with the ILWU's position that PMA, as a party to the

6  PCLCD, was a necessary party to any action to set aside the PCLCD.  (Dkt. #125.)

7       On January 3, 2017, Plaintiffs served the TAC.  (Dkt. #126.)  Although the

8  Court did not find PMA to be a necessary party to resolve Plaintiffs' damages claim

9  against the ILWU, and notwithstanding the representations Plaintiffs made to the

10 Court in opposing the ILWU's motion for joinder, the TAC seeks damages against all

11 defendants, including PMA.  (TAC ¶ 109.)  Moreover, the TAC continues to designate

12 the dismissed Iron Workers plaintiffs as plaintiffs, and on its face asserts claims on

13 behalf of the Iron Workers plaintiffs against both the ILWU and PMA, even though

14 the Iron Workers plaintiffs were dismissed from the case before PMA was joined as a

15 defendant.  (Id. ¶¶ 8-13 (listing Iron Workers as Plaintiffs); id., at 28 (seeking relief on

16 behalf of "Plaintiffs" against "Defendants")).

17 **IV.   ARGUMENT**

18      To survive a motion to dismiss for failure to state a claim, the plaintiff must

19 allege "enough facts to state a claim for relief that is plausible on its face."  *Bell Atl.*

20 *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While the Court must accept well-pled

21 factual allegations as true and view them in the light most favorable to the nonmoving

22 party, the Court should *not* accept unsupported conclusions, unwarranted inferences,

23 or sweeping legal conclusions.  *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

24 ("'naked assertion[s]' devoid of 'further factual enhancement'" inadequate); *Moss v.*

25 *U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) ("*non-conclusory* 'factual

26 content,' and reasonable inferences from that content, must be plausibly suggestive of

27 a claim entitling the plaintiff to" a claim for "relief" (emphasis added)).

28

The Ninth Circuit has recognized that it is particularly important for a court to exercise its gatekeeper function in antitrust cases, "because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).  Thus, in the antitrust context, "a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles." *William O. Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (quoting *Twombly*).  Toward that end, "[i]t is axiomatic that antitrust claims must 'make economic sense.'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 1002 (9th Cir. 2000).

## A. The TAC Fails to Plausibly Allege Significant Anticompetitive Effects Within Any Relevant Market.

"In order to establish a claim under Section 1 [of the Sherman Act], a plaintiff must demonstrate . . . that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis. . . ." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (quotations omitted).  As shown below, a rule of reason analysis applies to the allegations in the TAC, requiring Plaintiffs to plausibly plead that the M&R Provisions have had anticompetitive effects in a relevant market. But Plaintiffs have not pled a relevant market at all, and their conclusory allegations of anticompetitive harm—purportedly inflicted by PMA member terminal operators on themselves—are utterly implausible and make no economic sense.

### 1. The Alleged Restraint Must Be Evaluated Under the Rule of Reason.

A restraint of trade is *per se* unlawful only "when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 949 (9th Cir. 1998) (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984)).  Where, as here, the alleged restraint is a concerted refusal to deal, "the

per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers *in order to discourage them from doing business with a competitor.*" *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986) (emphasis added).  Where the purpose of the concerted refusal to deal is not to discourage the boycotted firms from doing business with a competitor, the *per se* rule is inapplicable. *See, e.g.*, *Adaptive Power Solutions*, 141 F.3d at 950 (where the boycotting customers were the only competitors in their market, boycott of supplier "did not disadvantage a competitor; thus, their boycott does not fit the per se category").

 Here, Plaintiffs do not allege that PMA member terminal operators refused to subcontract to them in order to discourage them from supplying their services to competing terminal operators, or to otherwise disadvantage competing terminal operators.  Indeed, the TAC does not even allege the existence of competing terminal operators.  Moreover, the M&R Provisions are not "naked restraints" of the type that always restrict competition; to the contrary, they actually articulate a *procompetitive* benefit:  to facilitate the "introduction of new technologies, including fully mechanized and robotic-operated marine terminals" that "necessarily displace[] traditional longshore work . . . ."  (PCLCD § 1.72.)  Thus, the allegations in the TAC do not fall within the narrow category of refusal to deal claims that have been accorded *per se* treatment, and the rule of reason applies.

### 2.  The TAC Does Not Allege Significant Anticompetitive Effects Within Any Alleged Relevant Market.

 "Under the rule of reason, to decide whether a challenged restraint is unreasonable under the Sherman Act, '[t]he focus is on actual effects that the challenged restraint has had on competition in a relevant market.'" *Adaptive Power Solutions*, 141 F.3d at 950 (quoting *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir. 1991)).  "'Proving injury to competition in a rule of reason case almost uniformly requires a claimant to prove the relevant market and to show the effects of competition within that market.'" *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 789

1    (9th Cir. 1996) (quoting *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir.

2    1988)) (requiring showing of increased prices in relevant market).  Such effects

3    typically take the form of increased prices or reduced output.  *See, e.g., Metro Indus.*

4    *v. Sammi Corp.*, 82 F.3d 839, 848 (9th Cir. 1996) (no showing of anticompetitive

5    effects where "no evidence of reduced output or increased prices").

6          Plaintiffs have failed to plausibly allege such effects.  Not only does the TAC

7    fail to allege a relevant market, but its allegation that PMA member terminal operators

8    have conspired to harm competition in a market in which they are *purchasers* is

9    implausible and nonsensical.

10                     a.    Plaintiffs Have Not Adequately Alleged a Relevant Market.

11          An antitrust plaintiff has an obligation to plead and prove a relevant market.

12   "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act

13   claim."  *Tanaka,* 252 F.3d at 1063.  It is insufficient to plead such a relevant market in

14   conclusory fashion; rather, "'[w]here the plaintiff fails to define its proposed relevant

15   market with reference to the rule of reasonable interchangeability and cross-elasticity

16   of demand . . . the relevant market is legally insufficient and a motion to dismiss may

17   be granted.'"  *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir.

18   2008); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105

19   (9th Cir. 1999) (dismissal where plaintiffs failed to "allege that Big Bear Valley is the

20   area of effective competition in which buyers . . . can find alternative sources of

21   supply, or that there are no other goods or services that are reasonably

22   interchangeable").

23          The TAC contains no definition of a relevant product market.  It defines the

24   "Relevant Work" (TAC ¶ 22), but avoids alleging whether the relevant product market

25   is a "labor market" for the Relevant Work (in which individual workers sell their labor

26   to companies that bid on and perform projects); a "services market" (in which

27   contractors sell the Relevant Work to terminal operators); or neither.

28

Instead, the TAC claims that the "market for labor" and the "market for contractor services" are "inextricably intertwined and there is inherent cross-elasticity of demand between the two." (*Id.* ¶ 28.) This assertion is simply incoherent. Cross-elasticity of demand is a measure of interchangeability of use between two products or services that are potential substitutes for each other, such that an increase in the price of one product or service will cause purchasers to switch to the other. *See, e.g.,* *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962) ("outer boundaries of a product market are determined by reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"); *Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991) (cross-elasticity of demand is extent to which "the rise in the price of a good . . . would tend to create a greater demand for other like goods in that market").

But Plaintiffs cannot possibly be suggesting that their contractor services are interchangeable with the labor provided by their employees; that they compete side by side with their employees (or their employees' unions) in the same market; or that terminal operators' demand for the services of individual workers would increase if contractors increased their prices (or vice versa). To the contrary, the TAC alleges that the individual workers and contractors sell at two separate levels: the workers sell their labor to the contractors who employ them, and the contractors in turn sell downstream to the "port managers." (TAC ¶¶ 23-25.) Any suggestion that the relevant product market includes both individual labor and contractor services thus contradicts both the rest of the TAC and simple logic.

Moreover, an antitrust plaintiff must show that the products within a relevant market are interchangeable, and that there are no other reasonably interchangeable substitutes. *See, e.g., Big Bear Lodging*, 182 F.3d at 1105. Yet the TAC's definition of "Relevant Work," and its apparent focus on companies that specialize in crane or other waterfront maintenance and repair work, fails to consider, for example, whether

maintenance and repair companies that have not traditionally performed this work may nevertheless have transferable skills and thus be potential substitutes for companies currently performing "Relevant Work." In any event, Plaintiffs' utter failure even to define a relevant market in a way that would enable identification of its participants—let alone account for potential substitutes—by itself warrants dismissal.

> b. Plaintiffs Have Not Plausibly Alleged Anticompetitive Effects.

"The plaintiff bears the initial burden of showing that the restraint produces 'significant anticompetitive effects' within a 'relevant market.'" *Tanaka,* 252 F.3d at 1063. In *Tanaka,* the court emphasized that it is insufficient for plaintiffs to allege that *they* lost business; they must plead and prove that *competition in the relevant market* was harmed:

> In short, Tanaka alleges nothing more than a personal injury to herself, not an injury to a definable market. But the antitrust laws were enacted for the protection of *competition, not competitors.* As we have explained, it is the impact upon competitive conditions in a definable market which distinguishes the antitrust violation from the ordinary business tort. *The failure to allege injury to competition is a proper ground for dismissal by judgment on the pleadings.*

*Id.* at 1064 (emphasis added) (internal quotations and citations omitted).

The TAC's meager attempt to allege anticompetitive effects in the relevant market is doomed, in the first instance, by the absence of a defined relevant market. But Plaintiffs have not plausibly alleged that the M&R Provisions harm competition in *any* market in which Plaintiffs might participate. Nor can they.

While Plaintiffs allege that they have been harmed as *competitors,* their allegations of harm to *competition* are limited to the conclusory assertion of an increase in "the price of the relevant work in the relevant market area" (TAC ¶ 59)—an assertion that is fatally vague on its face, as it is impossible to determine whether

"price" refers to the wages paid to workers or to the contract prices charged by contractors.  But even if the TAC is construed as alleging that PMA member terminal operators are paying higher prices to contractors as a result of the M&R Provisions, and are thus victims of reduced competition, such an allegation is inherently implausible—and in any event does not constitute cognizable competitive harm.

"Antitrust claims must make economic sense." *Adaptive Power Solutions,* 141 F.3d at 952 (citing *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 468 (1992)); *Universal Grading Serv. v. eBay, Inc.*, No. C–09–2755 RMW, 2011 WL 846060, at *6 (N.D. Cal. 2011) (granting motion to dismiss where "plaintiffs have failed to establish a plausible claim of *harm to competition* that makes 'economic sense'" (emphasis added)).  However Plaintiffs define their relevant market, their claim depends on the allegation that Plaintiffs are sellers in that market, and the PMA member terminal operators are buyers.  But it makes no economic sense for buyers to conspire to reduce competition among sellers in the market in which they buy.  *See, e.g., Adaptive Power Solutions,* 141 F.3d at 952-53 (allegation that customers conspired to boycott supplier in retaliation for price increase, creating monopoly in only remaining supplier, made no economic sense); *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir. 1987) (it would be "illogical" for customer to conspire to restrict competition in a market for services the customer requires).

And if the M&R Provisions do not harm purchasers, then they do not create anticompetitive effects that can be remedied under the antitrust laws:

> Of course, conduct that eliminates rivals reduces competition.  But reduction of competition does not invoke the Sherman Act *until it harms consumer welfare.*

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (emphasis added).  Here, the affected consumers of Plaintiffs' services are the very terminal operators who are accused of anticompetitive conduct through a labor agreement

PMA negotiated on their behalf.  Plaintiffs cannot credibly allege that these operators have acted against their own welfare.

Moreover, there is no allegation that the M&R Provisions have enabled any contractor, or group of contractors, to charge terminal operators a supracompetitive price for the Relevant Work, or even that ILWU-affiliated contractors have increased their prices as a result of reduced competition.  *See, e.g., id., at 1433* ("act is deemed *anticompetitive* under the Sherman Act only when it harms both allocative efficiency *and* raises the price of goods above competitive levels or diminishes their quality" (emphases in original)).  Rather, the TAC alleges that the PMA terminal operators still "compete against each other for business at West Coast ports."  (TAC ¶ 19.)

Indeed, there is no allegation that the M&R Provisions have even reduced the number of competitors:  While the TAC alleges that the M&R Provisions have prevented non-ILWU contractors from competing for certain projects, plaintiffs admit that ILWU contractors have *entered* the market as a result of the M&R Provisions.  (TAC ¶ 36 ("*None* of those [pre-2008] projects were performed by [ILWU members] or members of any other non-Iron Worker union.") (emphasis added)).  Substituting new competitors for old competitors, without decreasing competitors or affecting market concentration, does not reduce competition.  *See, e.g., Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) ("A decrease in one competitor's market share . . . affects competitors, not competition. . . . Shifting [plaintiff's] sales to . . . other competitors in the market does not directly affect consumers . . . .").

In fact, Plaintiffs do not allege even that they, or any other competitors, have been excluded from performing the Relevant Work in West Coast ports.  The M&R Provisions impose no limitations on bidding for work at port facilities that are not privatized (and thus not run by PMA member terminal operators), at locations that were "red-circled" in the PCLCD, or for work subject to the agreement's "past practice" exception.  And even where the M&R Provisions do apply, the TAC alleges

that their intent is not to drive contractors out of the market, but "to require that any worker performing the relevant work in the relevant market area be a member of the ILWU and that any contractor performing work in the relevant market area be signatory to the ILWU."  (TAC ¶ 57.)  Plaintiffs admit that they, unlike the unions whose claims have been dismissed, "need not be eliminated as participants in the relevant market"—no matter how much of the Relevant Work PMA members control—if Plaintiffs use ILWU members to perform the work.  (*Id.* ¶ 52.)

At its core, the TAC does not allege that the M&R Provisions have had either the intent or the effect of reducing competition among contractors for subcontracts involving the Relevant Work.  At most, the TAC alleges that the M&R Provisions require that Plaintiffs, and other contractors seeking to compete for the Relevant Work be—or become—signatories to a collective bargaining agreement with the ILWU. This does not amount to a reduction in competition.

**B.  Plaintiffs' Section 2 Attempted Monopolization Claim Should Be Dismissed for Failure to Allege That Any Entity Has a Dangerous Probability of Achieving Monopoly Power in Any Relevant Market.**

Plaintiffs also allege that Defendants have "attempted to monopolize work in the relevant market area" in violation of Section 2 of the Sherman Act.  (*Id.* ¶ 91.)  To state a claim for attempted monopolization, plaintiffs must plead that (i) defendants engaged in predatory or anticompetitive conduct; with (ii) an intent to monopolize; and (iii) a dangerous probability of success.  *Cascade Health Solutions v. Peacehealth,* 515 F.3d 883, 893 (9th Cir. 2008).

For an attempted monopolization claim to succeed, however, there must be an attempt to create a monopoly power *in a single firm.*  Section 2 "does not govern single-firm anticompetitive conduct aimed only at creating an oligopoly . . . ." *Rebel Oil,* 51 F.3d at 1443 (quoting *Ind. Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1416 (7th Cir. 1989)).  Thus, in pleading the elements of an attempted

1  monopolization claim, plaintiff must allege an intent, and a dangerous probability, of

2  monopolizing the relevant market for a single entity.

3     The TAC, however, fails to identify any such putative monopolist.  At best, the

4  TAC alleges that the putative monopolist is the ILWU.  (*See, e.g.,* TAC ¶¶ 2 (alleging

5  that ILWU "and its affiliated local unions" are "attempting to monopolize certain

6  types of work"); 52 ("[b]y monopolizing . . . labor, the *Defendant labor organizations*

7  can monopolize the relevant work"(emphasis added)); 59 ("the goal and purpose of

8  these provisions is to allow *Defendant labor organizations* to monopolize the relevant

9  work" (emphasis added))).  Such allegations, however, are contrary to the

10 fundamental nature of labor unions, including the ILWU.

11    The TAC assumes an alternate reality in which labor unions "sell" the labor of

12 their members to the companies with which they enter into collective bargaining

13 agreements.  But labor unions are membership organizations that represent workers.

14 As the PCLCD makes clear, the ILWU does not employ the workers it represents, and

15 thus cannot "sell" their labor; rather, the ILWU negotiates the terms and conditions

16 under which those workers provide their labor to their employers.  (*See, e.g.,* PCLCD,

17 at 2 ("This Contract Document . . . shall apply to all employees who are *employed by*

18 *the members of the [PMA]. . . .*" (emphasis added)).[4]  This Court recognized as much

19 in dismissing the Iron Workers' antitrust claim for lack of standing:  "[I]t is the

20 laborers they supply—*i.e.,* the employees whom the Union Plaintiffs represent—who

21 perform the relevant work and who thus are the competitors in the market."  (Dkt. #52

22 at 11 (citing *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987)).)

23    To the extent that the alleged relevant market is a market for the sale of labor,

24 the sellers are the individual workers, none of whom is alleged to be a putative

25

26 [4] Notably, the Clayton Act recognizes that the "[t]he labor of a human being is not a
   commodity or article of commerce," and thus "labor . . . organizations, instituted for the

27 purposes of mutual help, and not having capital stock or conducted for profit" may not "be
   held or construed to be illegal combinations or conspiracies in restraint of trade, under the

28 antitrust laws."  15 U.S.C. § 17.

1  monopolist.  To the extent that the relevant market is a contractor services market, the

2  sellers are the contractor employers, none of which is alleged to be a putative

3  monopolist.  Either way, the ILWU is not a competitor in the relevant market at all, let

4  alone one with a dangerous probability of obtaining monopoly power.

### C. Plaintiffs' Antitrust Claim Is Barred by the Nonstatutory Labor Exemption to the Antitrust Laws.

7      Notwithstanding its attempt to couch this dispute using the language of antitrust

8  jurisprudence, the TAC makes absolutely clear that this is a labor dispute, not a

9  commercial dispute:  "The [former] *Plaintiff Unions* are the target of the Defendants'

10  unlawful conduct, in that it is the intent, purpose and foreseeable consequence of

11  Defendants' action that *Plaintiff Unions* no longer be able to perform the relevant

12  work in the relevant market area."  (TAC ¶ 30 (emphases added).)  The gravamen of

13  the TAC's allegations is that the PCLCD, a collective bargaining agreement, requires

14  the signatory employers to use the labor of the signatory union, rather than the labor of

15  one of that union's rivals or non-union labor.  Such allegations are immunized by the

16  nonstatutory labor exemption to the antitrust laws.

17      The Ninth Circuit has adopted the Eighth Circuit's test from *Mackey v. NFL,*

18  *543 F.2d 606 (8th Cir. 1976),* to determine whether the nonstatutory exemption

19  applies to a labor agreement.  *See Phoenix Elec. Co. v. NECA*, 81 F.3d 858, 861 (9th

20  Cir. 1996).  Under the *Mackey* test, a restraint does not violate antitrust law if (i) the

21  restraint primarily affects the parties to the agreement and no one else; (ii) the

22  agreement concerns wages, hours, or conditions of employment that are mandatory

23  subjects of collective bargaining; and (iii) the agreement is produced from bona fide,

24  arm's-length collective bargaining.  *Id.*  All three elements are met here.

### 1. The M&R Provisions Primarily Affect the Parties to the PCLCD.

26      The TAC does not allege that the M&R Provisions bind anyone other than the

27  parties thereto—*i.e.,* the ILWU, PMA, and PMA's member companies.  While the

28

1   M&R Provisions may have an indirect effect on third parties, such as Plaintiffs, that

2   effect does not defeat the exemption.  *See, e.g., Phoenix Elec.,* 81 F.3d at 862

3   ("agreement affects only the parties" where it "does not attempt to impose its terms on

4   any nonsignatory party"); *ILWU v. ICTSI Or., Inc.,* 15 F. Supp. 3d 1075, 1093-94 n.8

5   (D. Or. 2014) ("[a]ll alleged anticompetitive conduct has some effect on consumers

6   and competitors, but courts look to the primary effect of the alleged agreement and

7   whether the alleged agreement 'imposes its terms on any nonsignatory party'")

8   (quoting *Phoenix Electric*).

9          In denying the ILWU's motion for summary judgment, this Court held that the

10  first prong of the *Mackey* test was not met.  In doing so, the Court relied primarily on

11  *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S.

12  616 (1975).  In *Connell*, however, a union attempted to organize subcontractors by

13  circumventing the collective bargaining process and coercing a *non-union* general

14  contractor, which otherwise had *no* relationship with the union, into agreeing not to

15  subcontract to firms that did have a contract with the union.  *Id.,* at 618, 626  ("Local

16  100 had no interest in representing Connell's employees").  But Plaintiffs here are

17  challenging the scope of work to be assigned to ILWU-represented employees of

18  PMA member terminal operators and their subcontractors as a result of PMA's

19  negotiation of a collective bargaining agreement on the terminal operators' behalf.

20         Moreover, a critical factor in *Connell* was the Court's observation that the

21  union's agreements with general contractors gave it "complete control" over the size

22  of the market for the subcontractors because "if the union thought the interests of its

23  members would be served by having fewer subcontractors competing for the available

24  work, it could refuse to sign collective-bargaining agreements" with other firms.  *Id.,*

25  at 624-25.  Here, however, there is no allegation that the union has any such control,

26  or that membership in PMA—which would confer signatory status to the PCLCD—is

27  not wide open to additional competing subcontractors.

28

The TAC alleges only that PMA members, signatories to a collective bargaining agreement with the ILWU, agreed to ensure the use of ILWU labor for work under their control.  While this alleged agreement may affect non-ILWU contractors, it does not impose or purport to impose its terms on them.  That is all the first prong of *Mackey* requires.

### 2.    The M&R Provisions Concern a Mandatory Subject of Bargaining.

"The assignment of work affects terms and conditions of employment, and therefore is a mandatory bargaining subject. . . ." *Antelope Valley Press*, 311 N.L.R.B. 459, 460 (1993).  This Court previously has held in this case that "the PCLCD addresses work assignment.  The relevant provisions of the PCLCD define the work at issue and assign that work to ILWU members."  (Dkt. #96, at 16.)  Thus, the alleged restraint "arises from mandatory bargaining subjects and meets the second prong of the *Mackey* test."  (*Id.*, at 18.)

### 3.    The M&R Provisions Are a Product of Bona Fide, Arm's-Length Bargaining Between PMA and the ILWU.

The third prong of *Mackey* is also met, because the PCLCD's M&R Provisions are a product of bona fide, arm's-length bargaining.  In *Phoenix Electric,* the Ninth Circuit held that the fact that the agreement at issue "was offered as an alternative to an across-the-board union wage cut" and was part of a "negotiated package" with benefits for both sides satisfied this requirement.  *Phoenix Electric,* 81 F.3d at 862.

Plaintiffs' conclusory allegations to the contrary notwithstanding, the M&R Provisions makes clear that the work assignment provision was part of a negotiated package that allowed PMA members to facilitate "introduction of new technologies, including fully mechanized and robotic-operated marine terminals" that "necessarily displace[] traditional longshore work . . . ."  (PCLCD § 1.72.)  Moreover, the TAC acknowledges that PMA and the ILWU have remained in dispute regarding the interpretation of the M&R Provisions, alleging that the provisions have been the

subject of the PCLCD's "dispute resolution mechanism" whereby the parties "have agreed to submit their disputes to a grievance and arbitration procedure."  (TAC ¶ 63.)

It is thus evident from the face of the TAC that the M&R Provisions resulted from bona fide, arm's-length bargaining.  This prong of the *Mackey* test is satisfied.

### D.  **Plaintiffs' and the Iron Workers' New Claims Against PMA That Violate the Court's Joinder Order Should Be Stricken.**

Without seeking or receiving leave of this Court, (1) the Iron Workers plaintiffs whom this Court already dismissed with prejudice, purport to bring news claims and (2) Plaintiffs purport to bring a new antitrust treble damages claim against PMA. These new claims violate this Court's December 28, 2016 Joinder Order and, in the event the TAC is not dismissed, should be stricken.

#### 1.   **The Iron Workers New Claims and Plaintiffs' New Damages Claims Against PMA Violate the Court's Joinder Order.**

The ILWU brought its motion to join PMA under Federal Rule of Civil Procedure ("Rule") 19(a), asserting that

the Court cannot order complete relief against the ILWU alone. This is because PMA and ILWU both negotiated and are both parties to the PCLCD and because Plaintiffs seek equitable relief barring enforcement of provisions of the agreement. . . .  An order or injunction against ILWU . . .  would not be binding on PMA.

(Dkt. #104-1 at 11-12.)[5]

As the Court characterized the ILWU's motion:  "Defendants claim that Plaintiffs' SAC challenges provisions of the PCLCD, and that, because PMA is a party to the PCLCD, PMA's presence is necessary in an *action to set it aside or to interpret its terms*."  (Dkt. #125 at 15 (emphasis added).)  The Court acknowledged that Plaintiffs "are only seeking monetary damages against [the ILWU] Defendants

---

[5] At the time the ILWU filed its joinder motion, "the Court [had] dismissed with prejudice all claims brought by" the Iron Workers, leaving "Surf City Steel, Inc. and Sarens, USA, Inc. [as] the only remaining Plaintiffs."  (Dkt. #125, at 4-5 n.2.)

(*not PMA*) . . . ." (*Id.* at 16 (emphasis added).)  The "inquiry becomes whether PMA must be joined for the Court to accord complete relief and *to invalidate or find unlawful certain provisions of the PCLCD*." (*Id.* (emphasis added).)[6]  Plaintiffs, who had chosen not to sue PMA in the first instance, vigorously opposed the joinder of PMA, having confirmed after discovery that "PMA has not engaged in anti-competitive conduct." (Dkt. #105, at 2; *see also id.*, at 1, 6.)  "[T]he Court order[ed] the joinder of PMA" as a necessary party under Rule 19(a) on the basis that "any court order granting *injunctive relief* that may strike down these provisions of the PCLCD would require the cooperation and participation of PMA to ensure that the PMA does not continue to enforce these provisions." (Dkt. #125 at 17, 21 (emphasis added).)  Accordingly, the Court did not give Plaintiffs *leave* to do anything, but rather affirmatively *ordered* them to join PMA under Rule 19(a) as an additional defendant on their claim for injunctive relief as to the PCLCD.  (*Id.* at 21.)  Instead, Plaintiffs included an antitrust treble damages claim against PMA.  Moreover, the Iron Workers plaintiffs reappeared in the TAC, bringing a new antitrust claim against PMA and reinstituting other claims against the ILWU, also without having sought or being given leave to do so.

---

[6]  The ILWU's joinder motion was not premised on any contention that PMA is a necessary party under Rule 19(a) as to Plaintiffs' antitrust damages claim against the ILWU, nor could it be.  Joint tortfeasors, such as PMA is alleged to be here (*see, e.g.*, TAC ¶¶ 45, 49, 50), are not necessary parties under the Rule:

> "It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990) (per curiam). . . . It therefore follows that a plaintiff is "not required to sue all of the alleged conspirators inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*, 668 F.2d 1014, 1053 (9th Cir. 1982). . . . For this reason, an absent antitrust co-conspirator generally will not be a required party under Rule 19(a)(1)(A), which applies only when a party's absence prevents the court from "accord[ing] complete relief among existing parties."

*Ward v. Apple Inc.*, 791 F.3d 1041, 1048-49 (9th Cir. 2015).

### 2.     The Iron Workers' Claims and Plaintiffs' Purported New Damage Claims Should Be Stricken.

Federal Rule of Civil Procedure 12(f) allows a court to strike from a pleading any "insufficient defense or any redundant, immaterial, impertinent or scandalous matter." A motion to strike will be granted if "'it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.'" *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178-79 (S.D. Cal. 2012) (quoting *Walters v. Fidelity Mortg. of Cal.*, 730 F. Supp. 2d 1185, 1196 (E.D. Cal. 2010)). An allegation is "redundant" if it is "'needlessly repetitive or wholly foreign to the issues involved in the action.'" *Taylor v. Stave, Inc.*, No. CV15-4190 FMO (ASx), 2016 WL 6674987, *1 (C.D. Cal. Jan. 4, 2016) (quoting *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002)). An "'immaterial' matter is that which has no essential or important relationship to the claim for relief…" *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds* in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994); *Taylor*, 2016 WL 6674987, at *1. "Impertinent" matter includes allegations that do not pertain, and are not necessary, to the issues in question. *Taylor*, 2016 WL 6674987, at *1.

The function of a Rule 12(f) motion is "'to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial.'" *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (quoting *Fantasy*, 984 F.2d at 1527). Granting a motion to strike is proper if it "will make trial less complicated or eliminate serious risks of prejudice to the moving party, delay, or confusion of the issues." *Sliger v. Prospect Mortg., LLC*, 789 F. Supp. 2d 1212, 1216 (E.D.Cal. 2011); see also *Fantasy*, 984 F.2d at 1527-28 (district court could properly strike lengthy, stale and previously litigated factual allegations in order to streamline action and focus the jury's attention on the real issues in the case).

California federal courts have granted motions to strike portions of amended complaints that were filed without permission. *See, e.g.*, *Benton v. Baker Hughes*, No.

23

CV 12-07735 MMM (MRWx), 2013 WL 3353636, at *2-3 (C.D. Cal. June 30, 2013) ("appropriate to strike the newly added claims" because plaintiff did not obtain leave to add new claims in amended complaint); *Kennedy v. Full Tilt Poker,* No. CV 09-07964 MMM (AGRx), 2010 WL 3984749, at *1 (C.D. Cal. Oct. 12, 2010) (noting that court had stricken amended complaint because plaintiff had not sought leave to add new claims); *Serpa v. SBC Telecomms., Inc.*, No. C 03-4223 MHP, 2004 WL 2002444, at *3 (N.D. Cal. Sept. 7, 2004) (striking damages claim that exceeded scope of order granting leave to amend allowing for equitable relief only); *Gerritsen v. Warner Bros. Entm't Inc.*, 116 F. Supp. 3d 1104, 1124-25 (C.D. Cal. 2015) (striking portions of amended complaint because new claims exceeded leave to amend); *DeLeon v. Wells Fargo Bank, N.A.*, No. 10-CV-01390-LHK, 2010 WL 4285006, at *3 (N.D. Cal. Oct. 22, 2010) ("[W]here leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken.").

The facts here are more egregious than in the cited cases.  The TAC violates the Court's Order granting the ILWU's motion to join PMA to accord the opportunity for full injunctive relief setting aside the M&R Provisions, because neither Plaintiffs nor the Iron Workers entities sought or were given leave to bring an antitrust damages claim against PMA.  Not only have Plaintiffs now asserted an antitrust damages claim against PMA—after representing to this Court that PMA did not engage in anticompetitive conduct—but the Iron Workers plaintiffs have reappeared in this action after having been dismissed with prejudice.  Consequently,  the Iron Workers' claims and Plaintiffs' antitrust damages claims against PMA should be stricken.[7]

---

[7] The Iron Workers' counsel has represented to PMA's counsel that, notwithstanding the allegations of the TAC, the Iron Workers do not seek to bring claims against PMA after all and that they are willing to so stipulate.  Having actually pled claims against PMA in the TAC, however, their only appropriate course now is to voluntarily dismiss them with prejudice before the Court is forced to dismiss them under Rule 12(f).

1

## V.    **CONCLUSION**

2
        Plaintiffs fail to assert, and cannot assert, a plausible theory of anticompetitive

3
harm in any relevant market.  Nor can they allege that any person or entity has any

4
probability of monopolizing any such relevant market.  And their allegations are

5
immune from antitrust scrutiny pursuant to the nonstatutory labor exemption.

6
        Accordingly, PMA respectfully requests that all claims against it be dismissed.

7
Should Plaintiffs' claims not be dismissed, however, PMA requests that the Iron

8
Workers' claims and Plaintiffs' damages claims against it be stricken, as they violate

9
the Court's December 28, 2016 Order.

10
                                Respectfully submitted,

11
                                MORGAN LEWIS & BOCKIUS LLP

12

13
                                By:/s/ Kent M. Roger_____

14
                                    Kent M. Roger
                                COHEN & GRESSER LLP

15
                                By: /s/ Ronald F. Wick_____

16
                                    Ronald F. Wick

17
                                *Attorneys for Defendant Pacific Maritime*
                                *Association*

18

19

20

21

22

23

24

25

26

27

28