1   Kent M. Roger (SBN 95987)
2   kent.roger@morganlewis.com
    MORGAN, LEWIS & BOCKIUS LLP
3   One Market Street
    San Francisco, CA 94105
4   Tel:  415.442.1000
    Fax:  415.442.1001
5
    Clifford D. Sethness (SBN 212975)
6   clifford.sethness@morganlewis.com
    Brian M. Hom (SBN 240055)
7   brian.hom@morganlewis.com
    MORGAN, LEWIS & BOCKIUS LLP
8   300 South Grand Avenue
    Twenty-Second Floor
9   Los Angeles, CA 90071-3132
    Tel:  213.612.2500
10  Fax:  213.612.2501

11  Ronald F. Wick (admitted *pro hac vice*)
    rwick@cohengresser.com
12  COHEN & GRESSER LLP
    2001 Pennsylvania Avenue NW, Suite 300
13  Washington, DC 20006
    Tel: 202.851.2070
14  Fax: 202.851.2081

15  *Attorneys for Defendant Pacific Maritime Association*

16

17                  UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
18

19

20  SURF CITY STEEL, INC., *et al.*,      Case No. 2:14-cv-05604-BRO-SS

21                  Plaintiffs,           The Hon. Beverly Reid O'Connell

22            vs.                         **DEFENDANT PACIFIC MARITIME
                                          ASSOCIATION'S REPLY
23  INTERNATIONAL                         MEMORANDUM OF POINTS AND
    LONGSHORE AND                         AUTHORITIES IN SUPPORT OF
24  WAREHOUSE UNION, *et al.*,            MOTION TO DISMISS THIRD
                                          AMENDED COMPLAINT OR, IN THE
                    Defendants.          ALTERNATIVE, TO STRIKE
25                                        CERTAIN PORTIONS THEREOF**

26                                        [FRCP Rules 12(b)(6) and 12(f)]]
                                          Date:  March 6, 2017
27                                        Time:  1:30 p.m.
                                          Court:  7C-7th Floor
28

---

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................... 1

II.   ARGUMENT.................................................... 1

    A.    The TAC Fails to Plausibly Allege Significant Anticompetitive Effects Within Any Relevant Market........................................ 1

        1.    The Rule of Reason Applies. ........................................... 1

        2.    The TAC Does Not Allege Significant Anticompetitive Effects Within Any Alleged Relevant Market. ............................ 3

            a.    Plaintiffs Have Not Adequately Alleged a Relevant Market........................................................................ 3

            b.    Plaintiffs Have Not Alleged Anticompetitive Effects........... 5

    B.    Plaintiffs' Section 2 Claim Fails to Allege That Any Entity Has a Dangerous Probability of Achieving Monopoly Power. .......................... 8

    C.    The Nonstatutory Labor Exemption Bars Plaintiffs' Claim. .................... 9

    D.    The Antitrust Damages Claims Against PMA Should Be Stricken. ......... 9

III.  CONCLUSION ............................................... 10

# TABLE OF AUTHORITIES

**Pages(s)**

**Cases**

*Adaptive Power Solutions, LLC v. v. Hughes Missile Sys. Co.*,
  141 F.3d 947 (9th Cir. 1998) ....................................................................... 8

*Allen Bradley Co. v. Local Union No. 3, IBEW*,
  325 U.S. 797 (1945) ..................................................................................... 8

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ..................................................................................... 1

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ..................................................................... 4

*Brown v. Pro Football, Inc.*,
  518 U.S. 231 (1996) ..................................................................................... 9

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ..................................................................... 3

*Coastal Transfer Co. v. Toyota Motor Sales, USA*,
  833 F.2d 208 (9th Cir. 1987) ....................................................................... 8

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977) ....................................................................................... 7

*E. Portland Imaging Ctr., P.C. v. Providence Health Sys.-Or.*,
  280 F. App'x. 584 (9th Cir. 2008) .............................................................. 9

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ..................................................................................... 2

*FTC v. Superior Court Trial Lawyers Association*,
  493 U.S. 411 (1990) ..................................................................................... 3

*Hahn v. Or. Physician Serv.*,
  868 F.2d 1022 (9th Cir. 1988) ..................................................................... 2

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959) ................................................................................. 1, 2

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ....................................................................... 6

*Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) ............................................................................... 2

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ........................................................... 3, 8

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ................................................................. 4

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421, 1433 (9th Cir. 1995) ................................................... 8, 9

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) ............................................................................. 5

*Ward v. Apple Inc.*,
    791 F.3d 1041 (9th Cir. 2015) ........................................................... 10

**Statutes**

29 U.S.C. § 151 ........................................................................................ 8

29 U.S.C. § 158(e) .................................................................................... 9

**Rules**

Fed. R. Civ. P. 15(a)(2) .......................................................................... 10

## I.   **INTRODUCTION**

Having failed to plausibly allege anticompetitive effects in any relevant market, Plaintiffs[1] confirm in their opposition that their theory of anticompetitive harm is fatally flawed.  Plaintiffs argue that they need not allege anticompetitive effects because their so-called "exclusion" from the alleged relevant market *is* an anticompetitive effect.  This argument derives from several faulty premises— including a market definition that Plaintiffs now admit is result-driven—which, if accepted, would swallow the axiom that "[t]he antitrust laws were enacted for the protection of *competition,* not *competitors.*"  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338 (1990) (internal quotations omitted).

Plaintiffs advocate the fanciful theory that the union affiliation of a contractor's employees constitutes a "brand," such that the PCLCD M&R Provisions, by allegedly requiring signatory PMA member companies to use ILWU labor to perform the Relevant Work, eliminate "inter-brand competition."  While this invention allows Plaintiffs to claim that even vigorous competition among ILWU contractors is merely "intra-brand," its factual underpinnings are fictional.  The absence of anticompetitive effects in the alleged relevant market is evidenced by the willingness of terminal operator consumers in that market to agree to the M&R Provisions—for which Plaintiffs offer no plausible explanation *other* than an absence of competitive harm.

Plaintiffs' opposition shows that the M&R Provisions cannot possibly have harmed competition.  The TAC should be dismissed, and amendment would be futile.

## II.   **ARGUMENT**

### A.   **The TAC Fails to Plausibly Allege Significant Anticompetitive Effects Within Any Relevant Market.**

#### 1.   **The Rule of Reason Applies.**

Plaintiffs argue for an unprecedented application of the *per se* rule, relying on Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959), for the proposition

---

[1] Capitalized terms (*e.g.,* "Plaintiffs") have meanings used in PMA's opening memorandum.

1  that the *per se* rule applies broadly to "group boycotts." (Dkt. #148, at 9.)  But

2  Plaintiffs ignore nearly 60 years of post-*Klor's* jurisprudence that recognizes the very

3  limitations on the *per se* rule articulated in PMA's opening brief.  *See, e.g., FTC v.*

4  *Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986) ("limited to cases in which firms

5  with market power boycott suppliers or customers in order to discourage them from

6  doing business with a competitor"); *Nw. Wholesale Stationers v. Pac. Stationery &*

7  *Printing Co.*, 472 U.S. 284, 294 (1985) (limited to joint activity "directly denying or

8  persuading or coercing suppliers or customers to deny relationships the competitors

9  need in the competitive struggle" (internal quotation marks omitted)).

10      In *Klor's*, a retailer was alleged to have used its "monopolistic buying power"

11  to coerce its suppliers into refusing to sell to a smaller competitor.  359 U.S. at 209

12  (internal quotations omitted).  The complaint alleged a "naked restraint," untethered to

13  any lawful agreement among the defendants.  Thus, to the extent *Klor's* remains

14  relevant to *per se* treatment of concerted refusals to deal today, it has no applicability

15  to the M&R Provisions, a single component of a negotiated collective bargaining

16  agreement with articulated procompetitive benefits.[2]

17      Plaintiffs' invocation of *Hahn v. Or. Physician Serv.*, 868 F.2d 1022, 1030 (9th

18  Cir. 1988), also fails.  None of the three characteristics of *per se* unlawful boycotts

19  articulated in *Hahn* is present here.  The M&R Provisions do not "cut[] off access to a

20  supply, facility or market necessary to enable the plaintiff to compete" (*see* Dkt. #148,

21  at 9); to the extent that using ILWU labor is necessary to compete for the Relevant

22  Work, Plaintiffs admit that they are able to do so.  (TAC ¶ 52.)  There is no allegation

23  that PMA member maintenance contractors "possess a dominant market position"

---

24  [2] Plaintiffs urge the Court to disregard the M&R Provisions' references to the introduction of
25  technological advances.  (Dkt. #148, at 12 n.4.)  But the agreement that certain maintenance
    and repair work "shall constitute the functional equivalent of such traditional ILWU work"
26  replaced by new technologies is integral to M&R Provisions.  (PCLCD § 1.72.)  The Court
    need not accept on this motion that new technologies are being introduced or that they are
27  procompetitive.  But the existence of such an agreement suggests makes it at least plausible
    that the M&R Provisions have a procompetitive justification, thereby (i) flatly precluding *per*
28  *se* treatment and (ii) rendering Plaintiffs' argument that PMA member terminal operators
    acted against their economic self-interest even more implausible.

(Dkt. #148, at 12); indeed, the TAC alleges that those contractors' collective pre-restraint market share was *zero*. (TAC ¶ 36.) And regardless of the Court's ultimate evaluation of the efficiency-enhancing justifications articulated in the M&R Provisions, there are at least "plausible arguments" that the provisions "enhance overall efficiency or competition." (Dkt. #148, at 12.) *See, e.g., Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003) ("When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, per se treatment is inappropriate, and the rule of reason applies.")[3]

Finally, Plaintiffs' tentative advocacy of the "quick look" standard of review is rejected by their characterization of that standard as applying "where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anti-competitive effect on customers and markets." (Dkt. #148 at 10 (citing *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011)).) No one would reasonably conclude that an agreement among customers to impose a labor-based requirement on their sellers would create self-inflicted harm. Absent visible anticompetitive effects, any reasonable person would conclude that the customers would not have entered into the agreement unless they were satisfied it would *not* injure competition for them and their markets.

### 2. The TAC Does Not Allege Significant Anticompetitive Effects Within Any Alleged Relevant Market.

a. Plaintiffs Have Not Adequately Alleged a Relevant Market.

Plaintiffs attempt to compensate for their failure to allege a relevant product market by falsely asserting that "the Court has defined this market as one for services provided by contractors such as the Plaintiffs." (Dkt. #148, at 18.) This Court never made any finding as to the relevant market; it simply determined that the *Iron Workers* entities (as opposed to individual workers) were *not* market participants. (Dkt. #40, at

---

[3] *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411 (1990), cited by Plaintiffs, is also inapposite because it involved "not only a boycott but also a horizontal price-fixing arrangement," and thus was distinguishable from "group boycott" cases that (like this case) "involved nonprice restraints." *Id.*, at 436 n.19.

12-13.)  Plaintiffs nevertheless continue to lump unions into their "market," asserting that the pre-restraint market included "unions which provided the labor to the contractors."  (Dkt. #148, at 18.)  And the TAC's allegation of "cross-elasticity" between labor and contractor services directly contradicts Plaintiffs' assertion of a *contractor*-only market.  (TAC ¶ 28.)  PMA is entitled to a pleading that contains a clear definition of the alleged relevant product market, rather than a moving target.

Moreover, Plaintiffs do not even address PMA's argument that the TAC fails to consider potential substitutes for companies specializing in crane or other waterfront maintenance and repair work, such as other maintenance and repair companies that may have transferable skills.  This failure violates Plaintiffs' obligation to allege that their proposed relevant market "is the area of effective competition in which buyers . . . can find alternative sources of supply, or that there are no other goods or services that are reasonably interchangeable."  *Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1105 (9th Cir. 1999).

Meanwhile, Plaintiffs' defense of their alleged three-state geographic market is fundamentally flawed.  Plaintiffs now admit that the TAC commits the cardinal economic sin of using the alleged restraint to define the market, claiming that "it is appropriate to define the relevant geographic area as that area which is subject to the anti-competitive provisions of the PCLCD."  (Dkt. #148, at 6.)  Courts have repeatedly rejected such cart-before-the-horse market definitions:

> Were we to adopt [the] position that contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, *any* exclusive dealing arrangement . . . would support a claim for violation of antitrust laws.  Perhaps for this reason, *no court has defined a relevant product market with reference to the particular contractual restraints of the plaintiff.*

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (emphases added) (citing additional cases).

4

Plaintiffs' *ipse dixit* that "the relevant work must be performed at a particular port on the West Coast" (Dkt. #148, at 6) does not inform the market analysis. The proper relevant geographic market is "the area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies." *United States v. Phila. Nat'l Bank,* 374 U.S. 321, 359 (1963) (internal quotation marks omitted). Thus, the issue is not where the work is performed—otherwise, each port would be its own market—but where customers can go to find suppliers to perform the work. The TAC makes no allegation that maintenance contractors located elsewhere in the United States—or, for that matter, the world—cannot practicably provide services at West Coast ports. Nor does it allege that contractors such as Plaintiffs are limited to serving West Coast ports. Absent such an allegation, Plaintiffs' proposed relevant geographic market, like their alleged relevant product market, is fatally deficient. Without a properly defined market, Plaintiffs cannot plead or prove that such a market has been harmed.

### b.   Plaintiffs Have Not Alleged Anticompetitive Effects.

As Plaintiffs' opposition makes shockingly clear, the TAC fails to allege, in non-conclusory fashion, that competition in any potential relevant market has been reduced—let alone that any anticompetitive effects have emanated from such a reduction. Plaintiffs do not allege or assert that the number of companies competing in the alleged relevant market has been reduced, that the alleged relevant market is any more concentrated as a result of the M&R Provisions, that the supply of available contracting services is in any way constricted, or that any contractor has been able to raise its prices or reduce its investment in quality as a result of the M&R Provisions. More pointedly, Plaintiffs do not allege that the PMA member terminal operators— the consumers of the Relevant Work, and thus the intended beneficiaries of the antitrust laws' protection of competition for the Relevant Work—are the least bit harmed by the M&R Provisions to which they agreed.

Instead, Plaintiffs argue that *their* supposed "exclusion" from the alleged

5

relevant market demonstrates that "Defendants have actually excluded competition," thereby proving "their market power to exclude competition."[4]   (Dkt. #148, at 19.)  Of course, Plaintiffs not only have failed to articulate any reason why their customers' requirement that they use ILWU labor precludes them from competing,[5] but they have affirmatively alleged the opposite.  (TAC ¶ 52.)

Even if Plaintiffs had been excluded, exclusion of individual competitors does not constitute harm to competition:  "It is injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant. . . . The elimination of a single competitor, without more, does not prove anticompetitive effect."  _McGlinchy v. Shell Chem. Co., 845 F.2d 802, 812 (9th Cir. 1988)._  Plaintiffs' focus on their purported "exclusion," coupled with their self-serving geographic market definition, demonstrates the circular nature of their antitrust claim:  They limit their relevant market primarily[6] to the subset of customers who are "excluding" them, then argue that because they are "excluded," competition in their "market" is harmed.  Such fallacious logic would argue that _any_ restriction imposed by _any_ group of customers on its suppliers harms competition in some "market."

---

[4] "Market power," a term that typically connotes the ability to influence other market participants' behavior by virtue of a high market share, tellingly has no place in this analysis. PMA member maintenance contractors allegedly were _non-participants_ in the relevant market when the M&R Provisions were agreed to.  (TAC ¶ 36.)  As for PMA member terminal operators, their ability to require _their suppliers_ to use ILWU labor has nothing to do with their market share and therefore their market power.

[5] The assertion that "the Union Defendants control which contractors may become signatory to the Union Defendants" (Dkt. #148, at 20 n. 8) is concocted out of whole cloth and utterly implausible.  Plaintiffs do not and cannot allege that the ILWU has _any_ ability to prevent them, or any of their competitors, from joining PMA and agreeing to recognize the ILWU as the collective bargaining representative of their employees and to comply with the PCLCD.

[6] Plaintiffs urge the Court to ignore the M&R Provisions' unambiguous exceptions to the ILWU's jurisdiction as "PMA's interpretation of the PCLCD," but Plaintiffs offer no competing interpretation.  (Dkt. #148, at 4 n.1.)  Plaintiffs' argument that the exceptions "can be limited or eliminated at any time" (_id._) is meaningless; at issue is the actual PCLCD, not what Plaintiffs' speculation about what the PCLCD "can be."  Plaintiffs' assertions about the percentage of the "market" represented by the exceptions are immaterial; this is not a market foreclosure case, and even if it were, Plaintiffs make no allegation that they are unable to perform the Relevant Work outside their alleged geographic market (further undercutting their market definition).  Finally, while Plaintiffs criticize PMA for not providing "support" for the proposition that not all purchasers of the Relevant Work are PMA members (Dkt. #148, at 6), Plaintiffs revealingly do not argue that only PMA members purchase this work.

1    Plaintiffs' most incredible attempt at a market harm theory, however, is their
2  argument that it does not matter how the market is defined, or whether price or quality
3  is impacted, because the M&R Provisions eliminate what Plaintiffs creatively dub
4  "inter-brand competition."  (Dkt. #148, at 20.)  According to Plaintiffs, the terminal
5  operators' requirement that their suppliers use ILWU labor limits competition to an
6  ILWU "brand."  This argument implausibly suggests that a potentially infinite number
7  of companies (including Plaintiffs) could compete vigorously, but the absence of
8  "inter-brand competition" would still constitute anticompetitive harm.

9    In any event, there is no basis in the TAC or case law for Plaintiffs' absurd
10  proposition that the union affiliation of a company's workers constitutes that
11  company's "brand."  The Supreme Court's explanation of interbrand and intrabrand
12  competition demonstrates their inapplicability here:

13     Interbrand competition is the competition among the *manufacturers* of
14     the same generic product television sets in this case and is the primary
15     concern of antitrust law. . . . In contrast, intrabrand competition is the
16     competition between the distributors wholesale or retail of the product *of*
17     *a particular manufacturer*.

18  *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977) (emphases added).

19    The Iron Workers and the ILWU are not manufacturers, nor do they play a role
20  even remotely analogous to manufacturers.  Plaintiffs' argument to the contrary
21  reflects their stubborn refusal to accept the reality that unions do not "supply" or
22  "provide" labor (TAC ¶ 25, Dkt. #148, at 12, 18)—even after this Court has ruled
23  otherwise (Dkt. #52, at 12).  The notion that Plaintiffs' use of ILWU labor would
24  somehow deprive PMA member terminal operators of the right to choose their
25  "brand" (a choice they allegedly have already made, via the PCLCD) is preposterous.

26    The absence of any effects of anticompetitive harm is not surprising, given the
27  illogic of a conspiracy allegation that accuses customers of conspiring to harm the
28  market in which they purchase.  Plaintiffs *concede* that "such an arrangement may not

7

1   make economic sense for the terminal operators." (Dkt. #148, at 12.)  While Plaintiffs

2   argue that the terminal operators' motives are irrelevant, the absence of motive fatally

3   undermines Plaintiffs' conclusory allegations of harm to competition.  *See Rebel Oil*

4   *Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("reduction of

5   competition does not invoke the Sherman Act until it harms consumer welfare").[7]

6        Plaintiffs do speculate that the terminal operators "may feel forced to enter into

7   this type of agreement to avoid retaliation" from the ILWU, such as "work

8   stoppages." (Dkt. #148, at 12.)  But such conjecture, even if alleged, would not solve

9   Plaintiffs' plausibility problem.  The idea that companies forfeited the right to buy in a

10  competitive market in order to preserve labor peace is not only improbable on its face,

11  but inconsistent with the TAC's allegations that the terminal operators were perfectly

12  willing to address the issue with the ILWU in the arbitration arena. (TAC ¶ 40.)[8]

13       **B.   Plaintiffs' Section 2 Claim Fails to Allege That Any Entity Has a**
           **Dangerous Probability of Achieving Monopoly Power.**
14

15       To support the claim that the ILWU can monopolize a market in which it does

16  not compete, Plaintiffs rely on *Allen Bradley Co. v. Local Union No. 3, IBEW*, 325

17  U.S. 797 (1945). (Dkt. #148, at 22-23.)  But *Allen Bradley,* which involved a union's

18  agreement with manufacturers and electrical contractors that employed its members,

19  did not hold that the union was a monopolist.  The Court referred to a "business

20  monopoly," 325 U.S. at 811, but did not address the identity of the monopolist, the

21  _____

22  [7] Plaintiffs' attempt to distinguish *Adaptive Power Solutions, LLC v. v. Hughes Missile Sys.*
    *Co.*, 141 F.3d 947 (9th Cir. 1998), and *Coastal Transfer Co. v. Toyota Motor Sales, USA,*
23  833 F.2d 208 (9th Cir. 1987), ignores the Ninth Circuit's recognition in both cases—pointed
    out in PMA's opening brief—of the implausibility of an allegation that purchasers in a
24  market would act to reduce competition in that market. (Dkt. #143, at 14.)

    [8] Moreover, it is *procompetitive* to avoid costly work stoppages through collective
25  bargaining.  Congress has stated that the right to collective bargaining "safeguards commerce
    from injury, impairment or interruption, and promotes the flow of commerce by removing
26  certain recognized sources of industrial strife and unrest."  National Labor Relations Act
    ("NLRA"), 29 U.S.C. § 151.  If the terminal operator consumers determined that any adverse
27  effect of the M&R Provisions was outweighed by the cost savings achieved through
    successful collective bargaining, then the M&R Provisions survive rule of reason analysis.
    *See, e.g., Paladin Assocs.,* 328 F.3d at 1156 (rule of reason analysis determines whether
28  procompetitive justifications outweigh anticompetitive effects of restraint).

1    market being monopolized, or even the distinction between Sections 1 and 2 of the

2    Sherman Act.  The sole focus was whether the union's participation immunized

3    otherwise unlawful conduct.  *Allen Bradley* does not permit Plaintiffs to ignore

4    decades of subsequent cases limiting Section 2 to monopolies by single firms that

5    compete in the relevant market.  *See, e.g., E. Portland Imaging Ctr., P.C. v.*

6    *Providence Health Sys.-Or.,* 280 F. App'x. 584, 586 (9th Cir. 2008) (dangerous

7    probability requires showing that defendant owns dominant share of relevant market);

8    *Rebel Oil,* 51 F.3d at 1443 ("To pose a threat of monopolization, one firm *alone* must

9    have the power to control market output and exclude competition").

10        **C.    The Nonstatutory Labor Exemption Bars Plaintiffs' Claim.**

11        By suggesting that the terminal operators' sole interest in the M&R Provisions

12   was a desire to use the collective bargaining process to avoid labor strife, Plaintiffs

13   further demonstrate that the terminal operators were clearly acting within the scope of

14   the nonstatutory labor exemption.  (Dkt. #148, at 12-13.)  The purpose of the

15   exemption is not to immunize collective bargaining conduct from legal scrutiny, but to

16   "substitute[] legislative and administrative labor-related determinations for judicial

17   antitrust-related determinations as to the appropriate legal limits of industrial

18   conflict."  *Brown v. Pro Football, Inc.,* 518 U.S. 231, 236-37 (1996).  In other words,

19   collective bargaining-related activity is not exempt because it is always lawful, but

20   because it is best evaluated under the laws and regulations specifically addressed to

21   it.[9]  The collectively bargained M&R Provisions fall squarely within the exemption.

22        **D.    The Antitrust Damages Claims Against PMA Should Be Stricken.**

23        Plaintiffs concede that the Iron Workers' claims against PMA "should be

24   withdrawn."  (Dkt. #148, at 23.)  The Court should thus grant PMA's motion to strike

25   these claims.  As to Plaintiffs' damages claim against PMA, Plaintiffs again concede

26   _____

[9] Section 8(e) of the NLRA makes it an unfair labor practice for an employer and a union to
27   enter into an agreement in which the employer explicitly or implicitly agrees to "cease doing
     business with any other person."  29 U.S.C. § 158(e).  Although this provision regulates
28   precisely the type of collective bargaining provision alleged here, Plaintiffs do not allege or
     argue that Section 8(e) has been violated.

that "PMA had not engaged in any anticompetitive conduct" yet contend that "[t]here is nothing in the [joinder] Order which precludes Plaintiffs from pursuing claims for damages against PMA" anyway.  (*Id.* at 24.)  But Plaintiffs neither sought nor received leave to amend their complaint to bring a damages claim against PMA pursuant to Fed. R. Civ. P. 15(a)(2).  The joinder Order was the Court's ruling on the *ILWU's* motion to join PMA as a *necessary party* under Rule 19(a) for purposes of according full relief were the Court to enter an injunction.

Having granted the ILWU's motion (Dkt. #125, at 19), the Court ordered Plaintiffs to effectuate it by adding PMA as a necessary party.  (*Id.* at 21.)  The Court did not grant Plaintiffs *leave* to file anything, let alone a damage claim as to which PMA could not be deemed a necessary party.  *Ward v. Apple Inc.*, 791 F.3d 1041, 1048-49 (9th Cir. 2015).  Thus, PMA's authorities, which Plaintiffs cavalierly dismiss as "involv[ing] a violation of a court order" (Dkt. #148, at 24), are applicable to Plaintiffs' exceeding the scope of the joinder Order without obtaining leave to amend.

## III.  **CONCLUSION**

For the reasons set forth herein and in PMA's opening brief, PMA respectfully requests that all claims against it be dismissed, or in the alternative, that all damages claims against it be stricken.

Respectfully submitted,

MORGAN LEWIS & BOCKIUS LLP

By: /s/ Kent M. Roger_____
    Kent M. Roger

COHEN & GRESSER LLP

By: /s/ Ronald F. Wick_____
    Ronald F. Wick

*Attorneys for Defendant Pacific Maritime Association*